JUDGE NATHAN

Sanjay Wadhwa
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| -against- | : |
| DAVID BLECH and MARGARET CHASSMAN, | : |
| Defendants. | : |

**ECF CASE**

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants David Blech ("Blech") and Margaret Chassman ("Chassman"), alleges as follows:

<u>SUMMARY</u>

1.      This case involves a complex market manipulation scheme carried out by Blech, an individual previously convicted of securities fraud and barred from association with a broker-dealer by the Commission. Since at least 2007, Blech, in furtherance of the scheme, established over 50 accounts using various nominees – including Blech's wife, defendant Chassman; Blech's uncle, Aaron Eiger ("Eiger"); Blech's sister-in law, Elizabeth Moore ("Moore"); a private religious institution, Central Yeshiva Beth Joseph ("Central Yeshiva"), managed by Blech's cousin, Mordechai Jofen ("Jofen"); Blech's

longtime acquaintance, James Reilly ("Reilly"), and an entity controlled by Reilly, Strategic Biotech Advisors, Inc. ("Strategic Biotech") (collectively, the "Nominees") – at different broker-dealers.  Using the Nominees' accounts, Blech manipulated the market in at least two issuers' securities by arranging for the Nominees to buy and sell significant blocks of stock using different broker-dealers on the same day.  By doing so, Blech created the artificial appearance of a market in these securities for several months and maintained the market price of the securities.  Blech also acted as an unregistered broker-dealer by, among other things, soliciting investors to invest in various companies. Finally, Blech and Chassman flouted federal registration and reporting requirements for securities transactions by: (a) failing to make filings required by Section 13(d) and Section 16(a) of the Exchange Act to disclose the transactions in the Nominees' accounts; and (b) repeatedly selling securities without satisfying the registration requirements as to such securities, or complying with any exemption from registration available under the federal securities laws.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

2.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].  The Commission seeks to permanently restrain and enjoin: (a) Blech from future violations of Sections 5(a), 5(c) and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1) and (3)], and Sections 10(b), 13(d), 15(a), 15(b)(6)(B), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78o(a), 78o(b)(6)(B) and 78p(a)] and Rules 10b-5(a) and (c), 13d-1, 13d-2 and 16a-3 thereunder

[17 C.F.R. §§ 240.10b-5(a) and (c), 240.13d-1, 240.13d-2 and 240.16a-3]; and (b) Chassman for violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], and Sections 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d) and 78p(a)] and Rules 13d-1, 13d-2, and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1, 240.13d-2 and 240.16a-3].  The Commission also seeks a final judgment ordering the Defendants to disgorge their ill-gotten gains (on a joint and several basis for the claims against Chassman) together with prejudgment interest thereon, and to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  In addition, the Commission seeks an order against Blech that: (1) requires him to comply with the Commission's prior order barring Blech from association with a broker or dealer, *In the Matter of David Blech*, Exchange Act Release No. 43693 (December 8, 2000) pursuant to Section 21(e) of the Exchange Act [15 U.S.C. § 78u(e)]; (2) prohibits him from directly or indirectly: purchasing any stock; promoting, advertising, or marketing any issuer of any stock; causing the promotion, advertising, or marketing of any issuer of any stock; or deriving compensation from the promotion, advertising, or marketing of any issuer of any stock, unless that stock is: (i) listed on a national securities exchange; and (ii) has had a market capitalization of at least $50,000,000 for 90 consecutive days; and (3) imposes a penny stock bar pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].  Finally, the Commission seeks any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to Section 20(d) and

22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].   Venue lies in this

Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections

21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa].   Certain

of the acts, practices, transactions, and courses of business alleged in this Complaint

occurred within the Southern District of New York and were effected, directly or

indirectly, by making the use of means or instrumentalities of transportation or

communication in interstate commerce, or the mails.

## DEFENDANTS

4.     Blech, age 56, resides in New York, New York.   In connection with his

activities as President of D. Blech and Co. in the 1990s, Blech pled guilty to securities

fraud and agreed to settle an injunctive action and an administrative action brought by the

Commission.   Specifically, on March 28, 1998, Blech pled guilty to two counts of

securities fraud and was sentenced to five years of probation.   *United States v. David*

*Blech,* 97 Crim. 403 (S.D.N.Y.) (KTD).   On December 5, 2000, Blech settled a

Commission injunctive action alleging market manipulation and agreed to be enjoined

from future violations of Section 17(a) of the Securities Act, and Sections 10(b), 15(c)

and 17(a) of the Exchange Act and Rules 10b-3, 10b-5, 15c1-2, 15c3-1, 17a-3, 17a-4,

17a-5 and 17a-11 thereunder.   *SEC v. David Blech, et al.,* 99 Civ. 4770 (S.D.N.Y.)

(RWS).   On December 8, 2000, Blech settled an administrative proceeding with the

4

Commission by accepting a permanent bar from associating with any broker-dealer. *In the Matter of David Blech*, Exchange Act Release No. 43693 (December 8, 2000).

5.     Chassman, age 58, is Blech's wife and resides with him in New York, New York.  Chassman held brokerage accounts in her name and in the name of Chassman Graphics.  Chassman Graphics was a graphic design company formed by Chassman in 1992; it has been defunct since 1996.  Chassman does not hold any securities licenses.

## RELEVANT ISSUERS

6.    **Pluristem Therapeutics Inc.** ("Pluristem") is a Nevada corporation headquartered in Haifa, Israel.  Pluristem's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Pluristem's voting stock has traded on the Nasdaq since December 10, 2007.  Prior to December 10, 2007, Pluristem traded on the OTCBB.  Pluristem files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

7.     **Intellect Neurosciences, Inc.** ("ILNS"), is a Delaware corporation headquartered in New York, New York.  ILNS's common stock, which is not registered with the Commission under Section 12(b) or 12(g) of the Exchange Act, trades on the OTCBB.

8.     **Collexis Holdings, Inc.** ("Collexis") is a Nevada corporation headquartered in Columbia, South Carolina.  Collexis's voting stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and it traded on the OTCBB between July 2007 and November 2009.  On November 2, 2009, Collexis filed a

Form 15 to terminate its reporting obligations, following which its common stock was traded on the Pink Sheets. On June 10, 2010, Elsevier B.V., a Dutch company, bought all of Collexis's assets.

## FACTS

### Blech's Role with the Relevant Issuers

9.     **Pluristem.**  In the beginning of 2007, Blech negotiated a term sheet with Pluristem that obligated Chassman "or other designees" to invest at least $8 million in a private placement deal (also known as a "PIPE," or private investment in public equity) of Pluristem's stock. Blech also negotiated a finder's fee to be received by Blech if he helped close the private placement by recruiting other investors. The finder's fee would consist of warrants equal to 7.5% of the shares purchased by the investors Blech recruited. After negotiating these terms, Blech found investors for Pluristem who purchased over 590,000,000 Pluristem shares in its May 2007 private placement. The investors Blech recruited included Wood River Trust, a trust Chassman established for the benefit of her and Blech's child, and several other individual and institutional investors. After the private placement, Wood River Trust owned over 10% of Pluristem's outstanding stock. As Blech's finder's fee, Pluristem issued a total of over 44.2 million stock warrants to two parties Blech designated.

10.     **ILNS.**  Blech had a key role in recruiting investors for ILNS and in funding its day-to-day operations. Blech, among others, founded ILNS in 2005. Blech caused ILNS to issue founding shares to his relatives, including an elderly relative ("Relative A"), Chassman and Eiger. Over time, as reflected in ILNS's Form 10K-SB/A for the period ending June 30, 2008, Blech provided ILNS "significant consulting

services" and also "arranged for third parties to invest the majority of the funds" received by ILNS through at least 2008.  For example, between 2006 and 2008, Blech and Chassman loaned ILNS over $3.5 million from a Chassman account.  ILNS relied on these loans to meet its basic operating expenses, including payroll.  In return for these contributions, ILNS provided Chassman a series of Promissory Notes, requiring the loans to be repaid at 8% interest and allowing her to convert this debt obligation into common stock at the conversion price of $1.75.

11.    **Collexis**.  Blech played a key role in Collexis.  As of February 14, 2007, a Chassman account held 31,648,910, or 52.4 %, of Collexis's outstanding common shares.  Blech recruited investors for Collexis, and as part of his recruitment efforts, arranged approximately 60 meetings between investors and Collexis's Chief Executive Officer.

## Blech's Manipulative Trading Scheme

12.    Blech engaged in a complex scheme to manipulate the market in Pluristem's and ILNS's stock at various points in 2007 and 2008.  First, Blech opened dozens of accounts in the names of the Nominees at several broker-dealers.  Second, Blech then used those Nominees' accounts to engage in deceptive activity, including carrying out matched trades in Pluristem's and ILNS's stock.  Blech traded in the Nominees' accounts with the intent to artificially inflate each company's stock price and to create the false impression of an active and liquid market for Pluristem's and ILNS's stocks, which were otherwise thinly traded securities.  Blech undertook this scheme to increase investor interest in Pluristem's and ILNS's stock and also used the artificially inflated value of the stocks as collateral for a line of credit he established in Chassman's name.

7

*Blech Used the Nominees to Create Dozens of Brokerage Accounts*

13.     Blech asserted control over dozens of the Nominees' accounts at various broker-dealers.  In all, Blech had control of over 50 accounts for the Nominees that placed trades in the securities of Pluristem, ILNS and Collexis.  Blech regularly used these accounts to execute trades and regularly arranged for money to be transferred between Chassman's bank account and the other Nominees' accounts.

14.     Blech made specific misrepresentations to several broker-dealers when he opened, or caused to be opened, brokerage accounts for the Nominees.  For example, a new account form Blech submitted for an account in Chassman's name in November of 2007 stated that Chassman was not a 10% owner of any public company.  However, Chassman clearly had that role with several companies, including with ILNS and Collexis.  Similarly, in connection with a trading authorization Blech filled out to give himself control over an account in Moore's name, Blech signed a form stating that he was not a control person for any issuer and did not have any non-public information for any issuer.

15.     Eiger did not grant Blech trading authority to buy and sell securities in his account, and, in fact, sent Blech a handwritten note in October of 2008, by certified mail, stating, "I must insist from this day — on October 2, 2008 — no stock purchases or sales of stocks should be made in my name."  Blech, however, persisted in using Eiger's accounts to make trades even after receiving this specific request.

*Blech Used the Nominees' Accounts to Trade Pluristem Securities*

16.     After Blech secured a role in Pluristem's private placement in early 2007, Blech used accounts in Chassman's, Chassman Graphics', and Eiger's names to make

voluminous purchases and sales of Pluristem stock from at least January 2007 through at least July 2007.  First, Blech made purchases designed to inflate Pluristem's stock price and to increase market interest in Pluristem in the months prior to the closing of that company's private placement offering.  Then, following the close of such offering, Blech placed sale trades through matched orders and used other deceptive tactics to sell a significant portion of the Pluristem stock he had purchased.

17.     Matched orders are orders for the purchase or sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale or purchase of such security.

18.     Between January 24, 2007, and March 30, 2007, the Nominees' accounts were net purchasers of Pluristem stock.  And, during that same period, Pluristem's stock price rose steadily, from $0.02 per share on January 24, 2007 to $0.13 per share on March 30, 2007.  This price increase benefitted Blech who sought to find investors for Pluristem's private placement, which offered restricted stock at $0.0125.

19.     After the private placement closed in May 2007, Blech, through accounts in Chassman's, Chassman Graphics', and Eiger's names, became a net seller of Pluristem's securities.

20.     Blech arranged for the Nominees' accounts to make matched trades throughout June and July 2007 to hide the selloff of Pluristem's securities.  Blech arranged for the Nominees to place buy orders at one broker-dealer while, at substantially the same time, he arranged for sell orders to be placed through Nominees' accounts at different broker-dealers.

21.     Chassman's and Eiger's brokerage accounts all made significant purchases of Pluristem at one broker-dealer while placing significant sell orders at other broker-dealers on the same day.  In each case, the accounts paid commissions to the broker-dealers entering both the buy and the sell orders.

22.     Blech's trading in the Nominees' accounts represented a substantial portion of the total volume traded in Pluristem's securities from at least January 2007 through July 2007.  Blech was aware that his trades significantly inflated the trading volume of Pluristem stock.  As of May 15, 2007, the Wood River Trust owned over 10% of the outstanding Pluristem stock.  The Wood River Trust reported that it acquired 100,000,000 shares of Pluristem, or approximately 10.3% of the outstanding stock, as of May 15, 2007 by filing a Schedule 13G dated July 26, 2007.  However, between May 2007 and August 2007, neither Blech nor Chassman made any filings with the Commission as required to report their purchases and sales of Pluristem securities and the change in their beneficial ownership.

*Blech Used the Nominees' Accounts to Trade ILNS Securities*

23.     Similarly, Blech used accounts in Chassman's, Moore's, Reilly's, and Strategic Biotech's names to make voluminous purchases and sales of ILNS stock to maintain the stock's volume and price.  Blech undertook purchases designed to inflate ILNS's stock price and increase market interest in ILNS.  Then Blech engaged in matched trades and other deceptive conduct to reduce his position in ILNS by selling a significant portion of the ILNS stock he had purchased.

24.     For example, on or about December 24, 2007, Blech used an account in Moore's name to sell 100,000 shares of ILNS stock at one broker-dealer at $0.25, while

using another account in Moore's name at a different broker-dealer to buy 10,000 shares of ILNS at $0.335 and an account in Reilly's name at a third broker-dealer to buy 85,000 shares of ILNS at $0.26. Similarly, on or about December 27, 2008, Blech used an account in Reilly's name to sell 35,919 shares of ILNS at one broker-dealer at $0.31 while using accounts in Moore's and Strategic Biotech's names at other broker-dealers to purchase 57,000 shares of ILNS between $0.38 and $0.43. On or about December 29, 2007, days after this trading activity, Blech sent an email to a senior officer at ILNS chiding him for the expenses incurred by the company and for the officer using his ILNS stock as collateral for a loan. In the email, Blech scolded, "I am working too hard to rebuild the stock to have my partner be a seller in the market every day."

25.     Blech continued to use the Nominees' accounts to purchase ILNS stock through mid-February 2008. The Nominees' accounts as a group – including accounts in Moore's and Reilly's names – were net purchasers of ILNS stock from approximately December 27, 2007 to February 15, 2008. During this period ILNS's stock price rose from $0.27 on January 14 to a peak of $0.87 on February 7, and remained over $0.70 until February 15.

26.     After February 15, 2008, the Nominees, as a group, become net sellers of ILNS stock on average (though not every day). During this time, in an effort to mislead the market into believing that there was still substantial buying interest in ILNS stock, Blech used accounts in Reilly's and Moore's names to buy ILNS stock at one set of broker-dealers while selling ILNS stock through another set of broker-dealers.

27.    Blech's trading through the Nominees' accounts constituted a substantial portion of ILNS's total trading volume. Blech was aware that his trades significantly inflated the trading volume of ILNS stock.

*Blech's Trades in Pluristem's and ILNS's Securities were Manipulative*

28.    Absent a manipulative intent, Blech's trades, described above, had no economic rationale. Blech repeatedly used the Nominees' accounts to buy Pluristem and ILNS stocks on the same day another account (often in the same Nominee's name) bought at least a portion of the same issuer's stock back. In these instances, the stocks were often purchased for the same price as (or a lower price than) the sale price, and the accounts incurred commissions and other transaction costs at both the broker-dealers through which the shares were being sold and the broker-dealers through which shares were being purchased.

29.    Blech's attempts to increase or maintain the price and volume of Pluristem's and ILNS's stocks served several purposes. First, Blech (through Chassman and the Wood River Trust) had substantial investments in Pluristem and ILNS. Blech had an interest in maintaining these securities' price and volume, especially in the periods when the companies sought to obtain financing. As described above, Blech was actively recruiting investors for a Pluristem private placement that closed in May 2007. His fundraising efforts correspond with the period in which accounts in Chassman's and Eiger's names were net buyers of Pluristem stock.

30.    Similarly, Blech was actively soliciting investors for ILNS, in late December and January, at the same time that accounts in Moore's, Reilly's, and Strategic Biotech's names were net buyers of ILNS stock. Blech told the representative of an

institutional investor in a January 22, 2008 email that he was close to closing a $12 million PIPE deal for ILNS. Although this financing effort was not successful, Blech's actions demonstrate his interest in driving up and then sustaining ILNS's stock price during that time.

31.     Blech's trading through the Nominees' accounts created the appearance of a liquid market in Pluristem's and ILNS's stock. The appearance of a liquid market benefitted Blech when the Nominees' accounts became net sellers of these securities.

32.     Moreover, on at least two occasions, Blech pledged ILNS's or Pluristem's stock as a portion of the collateral for a line of credit he established in Chassman's name with a lender. Specifically, on March 28, 2007 and March 30, 2007, Blech transferred a total of 20,000,000 shares from an account in Eiger's name to the lender. The lender then permitted Blech and Chassman to draw down $1,000,000 on Chassman's line of credit. Similarly, on February 6, 2008, Blech's office sent a letter, purportedly from Chassman, to ILNS's transfer agent directing that 683,200 ILNS shares be transferred to the lender. These shares had previously been registered to two relatives of Blech, including Relative A, but Blech transferred the shares to secure Chassman's credit line.

### Blech's Undisclosed Trading in Collexis Securities

33.     As of February 2007, Chassman held over 50% of the outstanding Collexis stock. Blech made purchases and sales of Collexis securities in accounts in the names of Chassman, the Spring Charitable Remainder Trust (a trust benefitting Chassman and Blech) and the other Nominees between February 2007 and 2009.

34.     Chassman reported that she acquired over 31 million shares of Collexis, or over 50% of the outstanding stock, as of May 23, 2007 by filing a Form 3, dated June 14,

2007. However, neither Blech nor Chassman made any additional required filings despite the transactions described above.

### Blech Used the Nominees' Accounts for Unregistered Offerings

35.    Blech also used accounts in Central Yeshiva's, Eiger's, and Chassman's names to transfer or sell unregistered ILNS securities. Blech used these accounts to conduct two types of unregistered offerings. For one type of unregistered offering, Blech obtained opinion letters that inaccurately referred to Chassman, Eiger, and Relative A as non-affiliates. Blech then arranged for the legend to be removed from restricted stock based on these inaccurate opinion letters. For another type of unregistered offering, Blech obtained so-called free-trading stock originally issued by the shell company involved in ILNS's reverse merger in 2007, and used certain Nominees' accounts to sell these shares without registering them. Both types of unregistered offerings, which are discussed below, are unlawful.

*False Opinion Letters*

36.    In April and May, 2008, Blech arranged for the restrictive legend to be removed from over 4.7 million ILNS shares — approximately 15% of ILNS's outstanding shares — held in the names of Chassman, Eiger, and Relative A.

37.    The "restrictive legend" is a legend the transfer agent places on stock certificates stating, among other things, that the shares represented by those certificates (a) have not been registered under the Securities Act; (b) are "restricted securities" as that term is defined in Rule 144 of the Securities Act; and (c) may not be offered for sale, sold, or otherwise transferred except pursuant to registration or an exemption from registration.

38.    ILNS used a transfer agent to issue and cancel share certificates.  Blech obtained unrestricted stock certificates for the 4.7 million ILNS shares from ILNS's transfer agent, a necessary prerequisite to reselling those shares.  Blech obtained the certificates by creating the false appearance that the transaction complied with the then-existing exemptions from registration contained in Rule 144 of the Securities Act.

39.    The ILNS transfer agent's ordinary business practice prior to issuing unrestricted ILNS's shares was to require a legal opinion which stated that the requested shares could be issued on an unrestricted basis, which it then relied on to issue the shares.

40.    Blech obtained three legal opinions for the shares held in Chassman's, Eiger's, and Relative A's names and caused them to be sent to ILNS's transfer agent. These opinion letters falsely stated that the that the "proposed sale of these shares will be exempt from the registration requirements of the Act by reason of, and as provisioned by, the exemptions contained under Rule 144, as amended effective 2/15/08."  As a purported basis for these legal conclusions, the letter stated the "[s]eller represents that it is not an affiliate nor a control shareholder of the Company, and is not selling on behalf of an affiliate."

41.    Blech knew that the opinion letters were false and misleading because he knew that Chassman, Eiger, and Relative A were all affiliates, as defined by Rule 144(a)(2) of the Securities Act.

42.    Blech and Chassman were affiliates as a result of Chassman's substantial debt and equity holdings in ILNS, and because ILNS relied on Blech's transfer of funds from Chassman's accounts to fund its basic operations.  Moreover, because Blech controlled the accounts in Eiger's and Relative A's names, they also were under common

control with ILNS.  For example, the correspondence that directed share transfers in their accounts came from Blech's office, and Relative A's shares were transferred to a lender on at least two occasions to secure Chassman's credit line.

43.     In May 2008, ILNS's transfer agent issued and sent to Blech and Chassman, stock certificates representing 4.7 million unregistered and purportedly unrestricted shares of ILNS.  Blech then transferred the shares to certain of the Nominees' accounts, including Eiger and Central Yeshiva.  At least some of these shares were eventually sold into the market.

*Shell Shares*

44.     Blech and Chassman also participated in the sale of unregistered ILNS stock using shares that were issued in connection with ILNS's reverse merger with Globepan Resources, Inc. ("Globepan"), a shell company, in January of 2007.

45.     Prior to this reverse merger, in July 2006, Globepan had registered the resale of 3.4 million shares of stock under Rule 415 of the Exchange Act.  The 3.4 million shares were purchased by a group of investors Blech controlled.  Specifically, Blech arranged for a group of investors, including certain of the Nominees, and other individuals (including brokers and investors Blech recruited to invest in ILNS securities), to obtain all of these shares.  Blech then negotiated with ILNS on behalf of these shareholders as to how many post-merger ILNS shares these shareholders would receive. In return for ILNS increasing the number of ILNS shares to 9 million that would be allotted to these shareholders, Blech agreed to lend ILNS an additional $4.5 million from Chassman's account.

46.     Because Blech and Chassman were the true purchasers of these securities and because they controlled ILNS and the shell company, Globepan, all the shares obtained through this transaction were control securities and thus could not be sold without complying with Rule 144 of the Securities Act.

47.     After the reverse merger was finalized, a portion of the ILNS stock was treated as free trading shares and sold into the market.  The shares were sold without filing a Form 144, and without complying with the applicable volume limitations and the manner of sale requirements under Rule 144 of the Securities Act.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
### (Against Blech)

48.     The Commission re-alleges and incorporates by reference paragraphs 1 through 47, as though fully set forth herein.

49.     From at least 2007 through end of 2009, or at various times during such period, Blech, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; or (b) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of the securities offered and sold by the Blech and other persons.

50.     As part of and in furtherance of this violative conduct, Blech, directly or indirectly, employed the deceptive devices, schemes, artifices, contrivances, acts,

transactions, practices, and courses of business and/or made misrepresentations and/or

omitted to state the facts alleged above.

51.    The false and misleading statements and omissions Blech made were

material.

52.    Blech knew, or was reckless in not knowing, that these material

misrepresentations and omissions were false or misleading.

53.    The material misrepresentations and omissions were in connection with

the purchase or sale of securities.

54.    By virtue of the foregoing, Blech, directly or indirectly, violated, and

unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### CLAIM II
#### Violations of Section 17(a)(1) and (3) of the Securities Act
#### (Against Blech)

55.    The Commission re-alleges and incorporates by reference paragraphs 1

through 54, as though fully set forth herein.

56.    By virtue of the foregoing, Blech, directly or indirectly, singly or in

concert, by use of the means or instruments of transportation or communication in

interstate commerce, or of the mails, or of the facilities of a national securities exchange,

in the offer or sale of securities, knowingly or recklessly: (a) employed devices, schemes,

and artifices to defraud; or (b) engaged in transactions, practices, or courses of business

which operated or would operate as a fraud or deceit upon purchasers of securities

offered and sold by Blech and other persons.

57.     As part of and in furtherance of a fraudulent scheme, Blech, directly or indirectly, singly or in concert, employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices, and courses of business and/or made misrepresentations and/or omitted to state the facts alleged above.

58.     The false and misleading statements and omissions Blech made were material.

59.     Blech knew, or was reckless in not knowing, that these material misrepresentations and omissions were false or misleading.

60.     The material misrepresentations and omissions were made in connection with the offer or sale of securities.

61.     By reason of the foregoing, Blech violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## CLAIM III
### Violations of Section 15(a) of the Exchange Act
### (Against Blech)

62.     The Commission re-alleges and incorporates by reference paragraphs 1 through 61, as though fully set forth herein.

63.     Blech, directly or indirectly, made use of the mails and other means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being registered as a broker or dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)], in violation of Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

64.     By virtue of the foregoing, Blech violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## CLAIM IV
### Violations of Sections 15(b)(6)(B) and 21(e) of the Exchange Act
### (Against Blech)

65.     The Commission re-alleges and incorporates by reference paragraphs 1 through 64, as though fully set forth herein.

66.     By acting as a broker-dealer, Blech willfully violated the Commission Order entitled *In the Matter of David Blech*, Exchange Act Release No. 43693 (December 8, 2000).

## CLAIM V
### Violations of Section 5(a) and 5(c) of the Securities Act
### (Against Blech and Chassman)

67.     The Commission re-alleges and incorporates by reference paragraphs 1 through 66, as though fully set forth herein.

68.     The ILNS shares Blech and Chassman offered and sold to the investing public constitute "securities" as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

69.     Blech and Chassman, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communications in interstate commerce, or the mails, to offer and sell securities through the medium of a prospectus or otherwise when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was available.

70.     By virtue of the foregoing, Blech and Chassman violated, and unless enjoined will continue to violate, Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77e(c)].

## CLAIM VI
## Violations of Section 13(d) of the Exchange Act
### and Rules 13d-1 and 13d-2 thereunder
### (Against Blech and Chassman)

71.     The Commission re-alleges and incorporates by reference paragraphs 1 through 70, as though fully set forth herein.

72.     The common stock of Pluristem and Collexis was registered pursuant to Section 12 of the Exchange Act and was listed on and traded on the OTCBB.

73.     At all times alleged in the Complaint, Blech and Chassman, together with accounts in Eiger's, Moore's, and Wood River Trust's names, acted as a "group for the purpose of acquiring, holding, or disposing of" Pluristem securities and thus, are deemed a "person" as defined by Section 13(d)(3) of the Exchange Act [15 U.S.C. §78m(d)(3)].

74.     At all times alleged in the Complaint, Blech and Chassman, together with accounts in Reilly's, Moore's and Spring Charitable Remainder Trust's names, acted as a "group for the purpose of acquiring, holding, or disposing of" Collexis securities and thus, are deemed a "person" as defined by Section 13(d)(3) of the Exchange Act [15 U.S.C. §78m(d)(3)].

75.     Between at least May 2007 and September 2007, Blech and Chassman, together with accounts in Eiger's, Moore's, and Wood River Trust's names, directly or indirectly, beneficially owned substantially more than 5% of the issued and outstanding shares of Pluristem.  The Wood River Trust reported that it acquired 100,000,000 shares of Pluristem, or approximately 10.3% of the outstanding shares, as of May 15, 2007.

Thereafter, neither Blech nor Chassman reported their beneficial ownership and changes in beneficial ownership of Pluristem stock.

76.    Between at least February 2007 through 2009, Blech and Chassman, together with accounts in Reilly's, Moore's and Spring Charitable Remainder Trust's names, directly or indirectly, beneficially owned substantially more than 5% of the issued and outstanding shares of Collexis.  Chassman reported her beneficial ownership in Collexis in June of 2007.  Thereafter, neither Blech nor Chassman reported any changes in beneficial ownership of Collexis stock.

77.    By reason of the foregoing, Blech and Chassman violated, and unless enjoined will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. 240.13d-1, 13d-2].

### CLAIM VII
### Violations of Section 16(a)
### of the Exchange Act and Rule 16a-3 thereunder
### (Against Blech and Chassman)

78.    The Commission re-alleges and incorporates by reference paragraphs 1 through 77, as though fully set forth herein.  The common stock of Pluristem and Collexis was registered pursuant to Section 12 of the Exchange Act and was listed on and traded on the OTCBB.

79.    Between May 2007 and August 2007, Blech, Chassman, Eiger, Moore, and Wood River Trust are deemed a "person" as defined by Rule 16(a)(1) of the Exchange Act [17 C.F.R. § 240.16a-1] as to the trading in Pluristem securities.

80.    Between February 2007 through 2008, Blech, Chassman, Reilly, Moore, and Spring Charitable Remainder Trust are deemed a "person" as defined by Rule

16(a)(1) of the Exchange Act [17 C.F.R. § 240.16a-1] as to the trading in Collexis securities.

81.    Between at least May 2007 and September 2007, Blech and Chassman, together with accounts in Eiger's, Moore's, and Wood River Trust's names, directly or indirectly, beneficially owned substantially more than 10% of the issued and outstanding shares of Pluristem.

82.    Between at least February 2007 through 2009, Defendants Blech and Chassman, together with accounts in Reilly's, Moore's and Spring Charitable Remainder Trust's names, directly or indirectly, beneficially owned substantially more than 10% of the issued and outstanding shares of Collexis.

83.    Wood River Trust reported that it acquired 100,000,000 shares of Pluristem, or approximately 10.3% of the outstanding stock, as of May 15, 2007 by filing Form 3.  Thereafter, neither Blech nor Chassman reported the subsequent sales and purchases of Pluristem stock in accounts in Chassman's name or the other Nominees' accounts by filing any Forms 4 or Forms 5 with the Commission during the remainder of May, June, July, or August 2007.

84.    After May 2007, neither Blech nor Chassman reported any of the purchases and sales of Collexis by filing Forms 4 or Forms 5 made by accounts in Chassman's name or by the other Nominees' accounts at any point between 2007 and 2009.

85.    By reason of the foregoing, Blech and Chassman violated, and unless enjoined will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. 240.16a-3].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Blech, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], Section 17(a)(1) and (3) of the Securities Act [15 U.S.C § 77q(a)(1) and (3)], Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], and Section 15(b)(6)(B) of the Exchange Act [15 U.S.C. §§ 78o(b)(6)(B)].

### II.

Permanently restraining and enjoining Blech and Chassman, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], Section 15(a) of the Exchange Act [[15 U.S.C. § 78o(a)], Section 13(d) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13d-1 thereunder [17 C.F.R. 240.13d-1, 13d-2], and Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. 240.16a-3].

### III.

Ordering Defendants Blech and Chassman to pay, on a joint and several basis, disgorgement along with prejudgment interest, all illicit trading profits, or other ill-gotten gains received as a result of the conduct alleged in this Complaint.

### III.

Ordering Defendants Blech and Chassman to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering Blech to comply with the Commission's prior order barring him from association with a broker or dealer, *In the Matter of David Blech*, Exchange Act Release No. 43693 (December 8, 2000).

### V.

Ordering Blech to refrain from directly or indirectly: purchasing any stock; promoting, advertising, or marketing any issuer of any stock; causing the promotion, advertising, or marketing of any issuer of any stock; or deriving compensation from the promotion, advertising, or marketing of any issuer of any stock; unless that stock is: (i) listed on a national securities exchange; and (ii) has had a market capitalization of at least $50,000,000 for 90 consecutive days.

## VI.

Permanently restraining and enjoining Blech from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VII.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 9, 2012

*Sanjay Wadhwa*

Sanjay Wadhwa
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181
Wadhwas@sec.gov

Of Counsel:

George S. Canellos (Canellosg@sec.gov)
Amelia A. Cottrell (Cottrella@sec.gov)
Charles D. Riely (Rielyc@sec.gov)
Shannon A. Keyes (Keyess@sec.gov)*

* not admitted in New York